**Martin Gardner REIFFIN, Plaintiff,**

v.

**MICROSOFT CORPORATION, Defendant.**

**No. C 98–266.**

United States District Court, N.D. California.

March 31, 2003.

See also, 42 Fed.Appx. 464.

John D. Vandenberg, Klarquist Sparkman Campbell Leigh & Whinston LLP, Portland, OR.

Eric L. Wesenberg, Orrick Herrington & Sutcliffe LLP, Menlo Park.

Norman H. Beamer, Fish & Neave, Palo Alto.

## ORDER

WALKER, District Judge.

On January 23, 1998, plaintiff commenced this action for patent infringement of two United States patents to which he holds the rights: US Patent Nos 5,694,603 ('603 patent) and 5,694,604 ('604 patent). See Doc # 1. On January 24, 2002, the court held a claim construction hearing. See Doc # 354. The court issued its claim construction order on April 30, 2002, which prompted the parties to file or renew the motions now pending. See Doc # 365.

Those motions include: (1) defendant's motion for partial summary judgment of invalidity and lack of priority under 35 USC §§ 112, ¶ 1 and 120 (Doc # 373); (2) defendant's motion for summary judgment of patent invalidity and unenforceability due to prosecution laches (Doc # 370); (3) plaintiff's motion to permit additional discovery pursuant to FRCP 56(f) (Doc # 406); (4) plaintiff's motion to enlarge time for hearing on defendant's prosecution laches and FRCP 56(f) motions (Doc # 416); (5) defendant's motion to strike the declaration of Richard Zaitlen (Doc # 420); (6) plaintiff's motion for leave to file a second amended complaint (Doc # 436); (7) defendant's motion for leave to file a surreply in opposition to plaintiff's motion for leave to file a second amended complaint (Doc # 446); and (8) plaintiff's motion for leave to file a surreply in support of the same (Doc # 449). This order addresses each of these motions in turn.

For the reasons detailed below, defendant's motion for partial summary judgment of invalidity and lack of priority (Doc # 373) is GRANTED. Defendant's motion to strike the Zaitlen declaration (Doc # 420) is GRANTED IN PART and DENIED IN PART. Plaintiff's FRCP 56(f) motion (Doc # 406) is DENIED. Defendant's motion for summary judgment of patent invalidity and unenforceability due to prosecution laches (Doc # 370) is DENIED. Plaintiff's motion to enlarge time (Doc # 416) is TERMINATED as an administrative matter. The parties' motions to file surreplies to plaintiff's motion for leave to file a second amended complaint (Docs ## 446, 449) are GRANTED. Plaintiff's motion for leave to file a second amended complaint (Doc # 436) is GRANTED IN PART and DENIED IN PART.

## I

Defendant has moved for summary judgment of patent invalidity, pursuant to 35 USC § 112, ¶ 1, and lack of priority, pursuant to 35 USC § 120. Doc # 373. Specifically, defendant argues that plaintiff's 1990 patent application, which resulted in the issuance of the '603 patent, does not disclose "multithreading" as claimed by plaintiff and as defined by the court in its claim construction order. See Doc # 365. Because the '603 patent is invalid for failure to comply with the written description requirement of 35 USC § 112,

¶ 1, defendant contends further that the '604 patent is not entitled to an effective filing date of 1990 (or earlier) under 35 USC § 120.

After discussing the written description requirement of § 112, ¶ 1, the court turns to the parties' competing interpretations of the invention described in the 1990 application and claimed in the '603 patent.

## A

Summary judgment is available in patent cases as in other areas of litigation. *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed.Cir.1994). In reviewing a summary judgment motion, pursuant to FRCP 56, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine.'"). The burden is on the moving party to demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Ultimately, the court must determine whether a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson*, 477 U.S. at 248–50, 106 S.Ct. 2505.

The nonmoving party may not simply rely on the pleadings, however, to claim that a genuine issue of material fact exists. The nonmoving party must support that claim with significant probative evidence. *TW Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The evidence presented by the nonmoving party "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

In the absence of a genuine issue of material fact, summary judgment is appropriate. Summary judgment will also lie "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial * * * since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

A party seeking a determination of patent invalidity faces a heightened burden of proof. "Because a patent is presumed to be valid, *see* 35 U.S.C. § 282 (1994), the party asserting invalidity has the burden of showing invalidity by clear and convincing evidence." *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1355 (Fed.Cir.1999) (citing *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed.Cir.1988)). "[I]n ruling on a motion for summary judgment, the judge must view the evidence through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505. "The 'clear and convincing' standard of proof is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of evidence.'" *Buildex v. Kason Industries, Inc.*, 849 F.2d 1461, 1463 (Fed.Cir.1988) (internal citations omitted). One articulation of the standard endorsed by the Federal Circuit defines clear and convincing evidence "as evidence which produces in the mind of the trier of fact 'an abiding conviction that the truth of its factual contentions are highly probable.'" *Id.* (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (internal citation omitted)).

Paragraph 1 of section 112 of Title 35 of the United States Code provides that "[t]he specification [in a patent application] shall contain a written description of the

invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains * * * to make and use the same * * *." *Id.*

"The purpose of the 'written description' requirement is broader than to merely explain how to 'make and use'; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of *the invention.*" *Vas–Cath v. Mahurkar,* 935 F.2d 1555, 1563–64 (emphasis in original). "Whether the claims of the [patent or patents at issue] are adequately supported by the written descriptions of the inventions set forth in the specification of those patents * * * is all that is required for compliance with the written description requirement of § 112, ¶ 1." *Reiffin v. Microsoft Corp.,* 214 F.3d 1342, 1345 (Fed. Cir.2000).

"Although the applicant does not have to describe exactly the subject matter claimed, the description must clearly allow persons of ordinary skill in the art to recognize that he or she invented what is claimed." *Vas–Cath,* 935 F.2d at 1563 (quoting *In re Gosteli,* 872 F.2d 1008, 1012 (Fed.Cir.1989); internal quotation marks and ellipsis omitted). An applicant may meet this requirement by providing a verbal description or a drawing that provides the relevant information. "The specification as originally filed must convey clearly to those skilled in the art the information that the applicant has invented the specific subject matter later claimed. When the original specification accomplishes that, regardless of how it accomplishes it, the essential goal of the description requirement is realized." *In re Wright,* 866 F.2d 422, 424 (Fed Cir.1989) (internal citation omitted).

In addition to express disclosure, an application may inherently disclose aspects or elements of an invention. "In order for a disclosure to be inherent, however, the missing descriptive matter must necessarily be present in the patent application's specification such that one skilled in the art would recognize such a disclosure." *Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1159 (Fed.Cir.1998). "Inherency * * * may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient. If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient." *In re Oelrich,* 666 F.2d 578, 581 (CCPA 1981) (internal citations omitted).

In reversing the court's previous order granting defendant's motion for summary judgment of patent invalidity under § 112, ¶ 1, the Federal Circuit expressly framed the specific task confronting the court: "Thus, * * * the 1990 application considered as a whole must convey to one of ordinary skill in the art, either explicitly or inherently, that [plaintiff] invented the subject matter claimed in the '603 patent." *Reiffin,* 214 F.3d at 1346 (internal citations omitted).

B

1

The 1990 application, entitled "Computer System with Real-time Code Processing," purports to disclose "a novel computer architecture providing real-time processing of language and other alphanumeric code concurrently as the code is being entered at the console." 1990 App (Doc # 311, Exh # 10) at A0297. "The language or other alphanumeric code processed by the present invention may be either a natural language such as English,

or a formal language such as a programming language, or the numbers and strings of a spreadsheet or database." *Id.* The scope of the invention is characterized as "[a] computer system for contemporaneous entry and analysis of character codes constituting a language having rules." *Id.* at A0323.

The application states that "[f]or purposes of illustration of the structure and operation of the present invention the disclosed embodiment is shown and described herein as a processor of a formal language; that is, a compiler of a programming language. However, it will be understood that substantially the same structure, operation, and lexical and syntactic analyses may be employed to process the code of a natural language * * *." *Id.* at A0298–A0299.

Plaintiff's specification describes a mode for distributing central processing unit (CPU) time between processing data already stored in a computer's memory and processing new data input by the keystrokes of a computer user. The goal of the system is to give the user the impression that the computer is responding to his keystrokes in real time, while the CPU is in fact alternating between processing previously stored data and keystrokes. The court has described this process previously in its claim construction order. See Doc # 365 at 3–4.

2

Defendant argues that there is simply no relationship between the process described in the 1990 application and the claims of the '603 patent as construed by the court, specifically the '603 patent's claim to a form of "multithreading." A brief recital of the court's constructions of several critical terms will set the stage for the discussion to follow.

MULTITHREADING

"[M]ultithreading shall be construed in each patent as explicitly defined in that patent." Claim Constr Order (Doc # 365) at 21. The '603 patent defines multithreading as

the concurrent time-sliced preemptive execution of a plurality of threads of instructions located within the same single operator-selected application program, whereby during execution of the program each thread may have at various times access to the same program address space, and with at least one thread invoked by a periodic clock-activated interrupt service routine which upon each activation asynchronously and preemptively takes control of the central processing means away from an executing thread at a repetition rate sufficiently fast so that even where the system contains only a single central processor the concurrent threads appear to execute effectively simultaneously and are so perceived by the user.

'603:1:24–37.

THREAD

"A thread is the execution of a sequence of instructions constituting one of the possibly many procedures, functions or subroutines within the program. Further, when interrupted, a thread's context must be saved and retrievable when a thread is reassigned control of the CPU and resumes execution." Claim Constr Order (Doc # 365) at 25.

TIMESLICE

A timeslice is "the fixed [ ] predetermined length of time during which each thread is given uninterrupted control of the CPU, at the expiration of which the executing thread is preempted in favor of another thread." Claim Constr Order (Doc # 365) at 28.

PREEMPTION

"[A] thread is 'preempted' when control is taken away from it." Claim Constr Order (Doc # 365) at 28.

## CONCURRENT

" 'Concurrently' thus refers to: A mode of operation wherein control of the CPU is alternated among executing threads of the same program at so rapid a rate that the multiple threads of execution appear to be executing simultaneously to the computer user." Claim Constr Order (Doc # 365) at 30.

### C

■ Defendant contends that the 1990 application does not disclose multithreading as its mode of operation, but in fact a much simpler—and much narrower—mode of operation.

The design described in the 1990 application contemplates the use of one of two models of CPU, the Z80 or the 8080. Plaintiff's design employs one of two kinds of interrupt pins employed by those CPUs. These interrupt pins could each potentially be activated to interrupt the CPU as required by plaintiff's design. The interrupt pin specified in the 1990 application is called INT*. See 1990 Appl (Doc # 311, Exh 10) at A311, A348. The distinctive feature of the INT* pin is that, once used to interrupt an ongoing process, the INT* pin is automatically disabled, thereby preventing further interruption of the newly initiated (i e, interrupting) process. The INT* pin remains disabled until an additional "Enable Interrupts" (EI) instruction is entered. See Lycklama Decl (Doc # 322), ¶¶ 15, 18–19.

The design described in the 1990 application using the INT* pin involves an interrupt initiated by a keystroke. In that model, a processing routine called a compiler continues to process stored data until interrupted. By striking a key on the keyboard, a computer user triggers an interrupt sequence, whereby the compiler's normal activity of processing stored data is preempted by an editor, which processes the information dictated by the keystroke.

Once that process is complete, the interrupt sequence returns control of the CPU to the compiler, which resumes processing stored data, which has been saved in the meantime.

An alternative version of this system uses not a keystroke but a clock as the trigger for the interrupt sequence. After specifying the keystroke-based system the 1990 application provides a brief discussion of such a clock-based variant:

[T]he interrupt which causes control of the CPU to pass from the compiler to the editor may be activated by a timer or clock instead of by the keyboard. That is, the compiler may be periodically interrupted and the input port polled to test if a key has been struck. If not, the interrupt is terminated and the control returns to the compiler. If polling the port reveals that a key has been struck then the interrupt service routine editor takes control and is executed in the manner described above for the disclosed preferred embodiment. For most applications clock interrupts at intervals of about every 10 to 30 milliseconds should be frequent enough to keep up with keys stroked at the keyboard.

1990 Appl (Doc # 311, Exh 10) at A320.

As defendant reads the 1990 application, the version of the system can only be read to operate as follows. A clock activates a CPU interrupt at periodic intervals, interrupting the ongoing function of the compiler only at those set times. The interrupt triggers a system check to determine whether a keystroke has been entered. If no keystroke has been entered, control returns immediately to the compiler. If a keystroke has been entered, the editor processes that keystroke to completion, then returns control of the CPU to the compiler for the duration of time before the next scheduled interrupt. See Def Mot (Doc # 373) at 6. Critical to defen-

dant's reading is the use of the INT* pin in this system. Because the INT* pin is automatically disabled once the compiler is interrupted, defendant argues that the system described only permits re-enablement of the INT* interrupt pin after the editor has finished processing a keystroke, if one has been entered. As a result, only one sequence of instructions, namely the compiler, can ever be interrupted in this system. See *id.* at 7.

On defendant's reading of the 1990 application, the specification suffers from six critical defects, which demonstrate that the 1990 application neither explicitly nor inherently discloses the claimed subject matter of multithreading. Multithreading, on defendant's account, involves a more complex system not even the faint outlines of which can be discerned in the 1990 application.

First, defendant argues that the editor cannot fit the definition of a thread, because it does not possess a requisite characteristic, namely, the capacity to be interrupted during multithreading. Def Mot (Doc # 373) at 18–19. If the editor is not a thread, defendant argues that a person of ordinary skill in the art would not understand the system described in the 1990 application as a form of multithreading, because only one thread, the compiler, is disclosed. See Lycklama Decl (Doc # 322), ¶¶ 116–17, 126. In other words, a description of a system with only one thread cannot be a description of *multi* threading.

Second, defendant argues that the absence of an explicit instruction, in the description of the keystroke-based embodiment of the design, to reenable disabled interrupts until after the performance of a task dictated by a keystroke demonstrates that the editor is incapable of interruption in the system described in the 1990 application. If the editor is incapable of interruption, it cannot be a thread.

Third, defendant contends that the 1990 application does not disclose any means of saving or retrieving information in the editor's context as required by the court's construction of the term "thread." See Claim Constr Order (Doc # 365) at 25. Again, the editor, on this reading, cannot be a thread.

Fourth, defendant asserts that the 1990 application does not disclose the preemption of more than one thread as required by the court's construction of "multithreading." See Claim Constr Order (Doc # 365) at 21; '603:1:24–37. If only one thread is preempted, the process described cannot be *multi* threading.

Fifth, defendant argues that the 1990 application fails to disclose the timesliced execution of a *plurality* of threads, i e, the interruption at a fixed predetermined time period of one *thread* in favor of another *thread*. On defendant's reading, only the compiler, and not the editor, is subject to fixed predetermined interruptions. Unlike the compiler, the editor operates for indeterminate amounts of time, depending on the time required for the processing of a task assigned by a struck key.

Sixth and finally, defendant asserts that multithreading requires the concurrent timesliced preemptive execution of *two or more* threads. Defendant contends that plaintiff's 1990 application discloses a system in which at most two threads are preempted. Hence, any claim asserting that plaintiff has invented a system for concurrently executing more than two sequences is broader than that disclosed in the 1990 application.

Plaintiff counters that the 1990 application clearly signals that the editor is capable of being interrupted. In articulating the clock-based variant, the 1990 application states that "clock interrupts at about every 10 to 30 milliseconds should be frequent enough to keep up with keys stroked

at the keyboard." 1990 Appl (Doc # 310, Exh 10), at A321. By implication, plaintiff argues, the system contemplated must be capable of performing all tasks dictated by keystrokes, regardless how long those tasks take.

In a nutshell, plaintiff's argument is that it makes no sense to imagine the system specified and ultimately patented as multithreading to be self-defeating. And so a person of ordinary skill in this art would not so interpret the 1990 application. Because some of the keystrokes expressly discussed in the description of the keystroke-based system involve control keys as opposed to alphanumeric keys (e g, a carriage return as opposed to a letter or number key), plaintiff argues that a person of ordinary skill in the art would understand in reading the specification of the clock-based variant, that control key operations would require time in excess of the 10–30 millisecond period of time specified by the application. Thus, a reader of the paragraph outlining the clock-based variant would necessarily recognize that the time for performing the editing function could—and indeed was likely to—run out before a control key function was completed. And that reader, if a person ordinarily skilled in the art, would naturally conclude that the clock-based variant would be designed to account for that fact.

From these two inherent disclosures—that keystrokes must not be lost and that some keystroke-initiated operations would take longer than 10 to 30 milliseconds to perform—plaintiff argues that a person of ordinary skill in the art would infer that the editor must be capable of interruption, i e, must be a thread. The interrupts described in the 1990 application would be understood to occur at regular intervals and to interrupt either the editor or the compiler, whichever was in operation at the time. This, plaintiff insists, is an inherent disclosure of the 1990 application's description of the clock-based variant, flowing naturally from a careful reading of the specification.

The question for the court is whether defendant has established by clear and convincing evidence that there is no genuine issue of material fact whether the 1990 application fails inherently to disclose multithreading. The court's role is not to focus on the relative merits of the competing positions, but rather to focus on the presence or absence of genuine issues of material fact and to do so in light of the applicable burden of proof.

To be adequate, the written description in the 1990 application "must * * * convey with *reasonable clarity* to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." *Vas–Cath,* 935 F.2d at 1563–64 (emphasis supplied; emphasis in original omitted). "[T]he description must *clearly* allow persons of ordinary skill in the art to recognize that [the patent-holder] invented what is claimed." *Id.* (emphasis supplied). "The specification must convey *clearly* to those skilled in the art the information that the applicant has invented the specific subject matter claimed." *Wright,* 866 F.2d at 424. And an inherent disclosure "must *necessarily* be present in the patent application's specification, such that one skilled in the art would recognize such a disclosure." *Tronzo,* 156 F.3d at 1159. "Inherency * * * may not be established by probabilities and possibilities. * * * [T]he mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Oelrich,* 666 F.2d at 581.

Whether expressly or inherently disclosed, then, multithreading must be present in the 1990 application with a sufficient degree of clarity to a reader of ordinary skill in the art. A proposed reading of a written description that rests on tenuous inferences from that description or an im-

plausible reading of ambiguous language in the description lacks the degree of clarity required. To come within the ambit of the definition of multithreading, the system described in the 1990 application must describe a system that provides for the "concurrent time-sliced preemptive execution of a plurality of threads of instruction within the same single operator-selected application program." '603:1:24–37.

The key language on which plaintiff relies comes in the final sentence of the paragraph describing the clock-based variant. It reads, "For most applications clock interrupts of about every 10 to 30 milliseconds should be frequent enough to keep up with the keys stroked at the keyboard." 1990 Appl (Doc # 311, Exh 10) at A320. Plaintiff argues that this sentence read in conjunction with the provision of the keystroke-based version of the system for the performance of control key functions teaches the lesson that keystrokes must not be lost. From this lesson, plaintiff asserts that several following inferences "flow[ ] from the operation as taught." *Oelrich,* 666 F.2d at 581. If keystrokes must not be lost, then the editor must be interruptible. If the editor is interruptible, then the editor must be a thread. If the editor is a thread, then the system contains two threads. If the system contains two threads, then it describes (or presages) a form of multithreading.

Plaintiff's reading of the above-quoted sentence, however, pushes the meaning of this sentence past its breaking point. The plain reading of that sentence is just what the sentence says: for most operations, a time interval of between 10 and 30 milliseconds will suffice. The reasonable inference to draw is that, if such an interval of time is inadequate, then the period between interruptions can be adjusted accordingly, e g, to 50 milliseconds. That reading still maintains the ability of the system to "keep up with keys stroked at

the keyboard," but requires only a simple adjustment in the time period involved to preserve that feature. It does not require the lengthy chain of inference plaintiff suggests and upon which his construction of the 1990 application depends.

The plain reading of the sentence is further bolstered by the fact that there is no express provision within the description for the saving and retrieving of the context of the editor, as required by the court's construction of the term "thread." The plain reading of the sentence does not require a reader to infer that the editor must be interruptible. And the description does not characterize the editor as having any features of a thread. The application's characterization of the compiler, by contrast, makes it clear that the compiler fits the definition of a thread. The language plaintiff used in the 1990 application to describe the clock-based variant does not support the inference that the editor must be interruptible in order for the clock-based variant to function as described. The editor cannot, therefore, be interpreted as a thread.

In reviewing the written description of the clock-based variant, the court concludes that a reasonable jury could not conclude, based on a reading of the 1990 application informed by the submission of the parties, that the clock-based variant of the system described in the 1990 application discloses a form of multithreading. The written description of the invention neither expressly nor inherently discloses that the editor is a thread. The system described, which contains only one thread, the compiler, cannot be interpreted as a multithreading system, as the term "multithreading" is defined in the '603 patent. Defendant has met its burden to show, by clear and convincing evidence, that there is no genuine issue of material fact on the basis of which a reasonable jury could

conclude that the written description of the invention in the 1990 application adequately describes the invention claimed in the '603 patent.

Because the court concludes that defendant has met its burden to prove by clear and convincing evidence that the 1990 application that led to the issuance of the '603 patent cannot reasonably be interpreted to disclose that both the editor and the compiler are threads, the written description in the 1990 application does not adequately describe the claimed invention. Therefore, defendant's motion for partial summary judgment of patent invalidity (Doc # 373) is GRANTED. The '603 patent is invalid under § 112, ¶ 1's written description requirement. Because the '603 patent is invalid on written description grounds, the '604 patent is not entitled to a priority date of 1990 or earlier as an extension of the earlier application. 35 USC § 120; see *Reiffin*, 214 F.3d at 1346; *Hyatt v. Boone*, 146 F.3d 1348, 1352 (Fed. Cir.1998); *Fiers v. Revel*, 984 F.2d 1164, 1169–70 (Fed.Cir.1993).

### III

The court next addresses defendant's motion to strike the declaration of Richard H Zaitlen (Zaitlen Declaration (Doc # 409)). Doc # 420. Plaintiff submitted this motion in connection with defendant's motion for summary judgment of prosecution laches. Defendant argues that Zaitlen states an inadmissible legal conclusion regarding the law of prosecution laches and lacks personal knowledge of a number of the facts the declaration asserts. Doc # 420.

### A

Zaitlen is a Los Angeles lawyer specializing in patent, trademark and copyright law. See Zaitlen Decl (Doc # 409) at 1, ¶ 1. Formerly, Zaitlen worked as an examiner in the United States Patent and Trademark Office (PTO). *Id.* at 3, ¶ 9.

Zaitlen reports that he was retained by plaintiff

> as an expert witness on the standards, practices and procedures regarding prosecuting patent application before the [PTO] and * * * asked to opine on whether [plaintiff's] prosecution of the applications that led to the issuance of the two patents in suit * * * was reasonable, or whether [plaintiff] unreasonably delayed that prosecution, or whether [plaintiff] committed any other act that [Zaitlen] would characterize as supporting a conclusion that the patents should be invalid or unenforceable because of prosecution laches.

*Id.* at 1–2, ¶ 3. In order to perform these tasks, Zaitlen relied on his review of the two patents in suit, defendant's motion for summary judgment due to prosecution laches, plaintiff's declaration and accompanying exhibits filed in opposition to defendant's motion and telephone conversations with plaintiff. See *id.* at 4, ¶ 12.

In his declaration, Zaitlen states the following two conclusions:

(1) To me the key requirement to making a showing of prosecution laches is proving, by clear and convincing evidence, unreasonable and unexplained delay in prosecution that prejudices intervening adverse rights. *Id.* at 2, ¶ 4.

(2) In my opinion, the facts of this case do not come close to justifying a conclusion of prosecution laches. All of [plaintiff's] actions during the prosecution were in accord with what a competent patent attorney reasonably would have done under the circumstances. *Id.* at 2, ¶ 5.

With respect to the first conclusion, regarding the required elements of a successful demonstration of prosecution laches, Zaitlen does not identify the grounds on which that conclusion is based. He

indicates that he has reviewed the recent Federal Circuit decision, *Symbol Technologies, Inc.*, 277 F.3d 1361, (Fed.Cir.2002), reviving the defense of prosecution laches in patent cases. See *id.* at 2, ¶ 4. Zaitlen asserts that in *Symbol* the Federal Circuit "held that such a defense was recognized as an equitable defense, and left for the future the definition of how the defense must be made out." *Id.* Zaitlen does not, however, cite case law or any other authority to support his further conclusions that (1) the elements of the prosecution laches defense are (a) an unreasonable and unexplained delay that (b) prejudices intervening, adverse rights; and (2) that those elements must be demonstrated by clear and convincing evidence. See *id.*

By contrast, Zaitlen does identify and discuss the bases for his conclusion that defendant's prosecution of the patents at issue does not constitute prosecution laches. After providing background information on PTO procedure generally (see *id.* at 4–6, ¶¶ 14–17), Zaitlen discusses the facts of the prosecution of plaintiff's two patents as those facts appear in plaintiff's declaration in opposition to defendant's prosecution laches motion and as they were reported to Zaitlen in his conversations with plaintiff. See *id.* at 6–13, ¶¶ 18–38.

### B

Civil Local Rule 7–5(b) specifies the permissible content of declarations filed to provide *factual* support for a motion or opposition to a motion filed with the court. See *id.* With respect to the form such a declaration must take, the rule provides that factual contentions contained in a declaration "may contain only facts, must conform as much as possible to the requirements of FRCivP 56(e), and must avoid conclusions and argument." Civ LR 7–5(b). Federal Rule of Civil Procedure 56(e) requires a sworn declaration to be based on the personal knowledge of the

declarant, to set forth facts that would be admissible in evidence and affirmatively to show the competence of the declarant to testify to its contents. See *id.* Pursuant to Civ LR 7–5(b), the court may strike all or part of any declaration that fails to comply with the terms of Civ LR 7–5.

"When a party opposing summary judgment fails to comply with the formalities of Rule 56, a court may choose to be somewhat lenient in the exercise of its discretion to deal with the deficiency." *School Dist. No. 1J, Multnomah County, Oregon v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir.1993) (citing *Scharf v. United States Attorney General*, 597 F.2d 1240, 1243 (9th Cir.1979); *United States v. Western Elec. Co., Inc*, 337 F.2d 568, 575 (9th Cir.1964); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "However, discretionary leniency does not stretch so far that Rule 56(e) becomes meaningless." *Id.* (citing *Peterson v. United States*, 694 F.2d 943, 945 (3d Cir.1982); *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir.1987)).

Contrary to defendant's initial assertion, plaintiff has not offered the Zaitlen declaration to provide additional factual support for plaintiff's opposition, but rather to state an expert opinion regarding the reasonableness of plaintiff's prosecution of his patents as he understands that prosecution to have occurred. The factual data on which he relies were, Zaitlen acknowledges, provided almost solely by plaintiff.

To be admissible, expert testimony must be (1) based on sufficient facts and data, (2) the product of reliable principles and methods, and (3) the result of the application of those principles and methods reliably to the facts of the case. See FRE 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct.

1167, 143 L.Ed.2d 238 (1999). In *Kumho Tire,* the Court clarified that *Daubert's* general principles, as reflected in the revised FRE 702, apply to expert testimony of all types. *Id.* at 149, 119 S.Ct. 1167. Federal Rule of Evidence 703 permits expert opinions to be based on facts or data "known or perceived by or made known to the expert at or before the hearing," whether or not those facts or data were presented to the expert in a form that would be admissible at trial. *Id.*

■ In the context of patent suits, the court may consider the expert testimony of a patent attorney if relevant. See *Endress + Hauser, Inc. v. Hawk Measurement Systems Pty. Ltd.,* 122 F.3d 1040, 1042 (Fed.Cir.1997); *Talarico v. Marathon Shoe Co.,* 182 F Supp 2d 102, 113 (D.Me. 2002). Expert testimony of a patent attorney may be admitted, even if the attorney does not have specific expertise regarding the technical field involved in the litigation before the court, because the attorney's familiarity (or lack of familiarity) with that technical field bears on the weight to be accorded the evidence, not the threshold question of admissibility. See *Neupak, Inc. v. Ideal Manufacturing and Sales Corp.,* 168 F Supp 2d 1012, 1015 (D.Minn. 2001); see also *Talarico,* 182 F Supp 2d at 113; *Biomedical Polymers, Inc. v. Evergreen Industries, Inc.,* 976 F.Supp. 98, 100 (D.Mass.1997).

### C

■ Zaitlen's declaration draws the two key conclusions identified above, one legal and one involving the application of a legal framework to the factual record provided Zaitlen by plaintiff.

Plaintiff denies that the declaration expresses any legal opinion on the basic law of prosecution laches. Plaintiff argues that the fourth paragraph "simply summarizes the applicable law of prosecution laches." Zaitlen Decl (Doc # 409) at 2, ¶ 4.

As both parties freely admit, however, the law of prosecution laches is by no means settled at present. It is not therefore susceptible to ready summary.

In fact, Zaitlen does draw a legal conclusion by identifying what he believes to be the elements of the defense of prosecution laches and the burden of proof a defendant must meet to present that defense successfully. Zaitlen offers no authority for his legal conclusions nor any reason to believe that they were reached by employing a reliable method of legal analysis. Given the state of the law of prosecution laches, the court cannot simply take Zaitlen's word that the elements of prosecution laches and applicable burden of proof are as he asserts. Zaitlen's legal conclusions regarding prosecution laches, lacking reliable foundation or support, must therefore be stricken. Defendant's motion to strike is GRANTED with respect to paragraph 4 of the Zaitlen declaration.

■ The remainder of the declaration, offered to support Zaitlen's conclusion that plaintiff's prosecution of his patents was reasonable, does not suffer from the same or a similar defect regarding its admissibility. The arguments defendant advances to challenge the remaining portions of the Zaitlen declaration go to the weight the court should accord Zaitlen's conclusion that plaintiff's prosecution of his patents was reasonable, not the admissibility of that conclusion.

Defendant complains that plaintiff's "testimony amounts to nothing more than the assertion: 'If [plaintiff] is telling the truth about how and why he amended, cancelled, and otherwise changed his claims, then [plaintiff] was justified in doing so.'" Def Reply (Doc # 434) at 5. But that—and nothing more—is what the Zaitlen declaration is offered to demonstrate. Defendant may well be correct that such a conclusion, based on such information, is of

little value to the court. Defendant's or the court's conclusion regarding the usefulness of the evidence does not affect the determination whether the Zaitlen declaration is admissible expert testimony on the question whether plaintiff has prosecuted his patents reasonably.

On summary judgment, it is the movant's—in this case, defendant's—burden to demonstrate the absence of a genuine issue of material fact. Plaintiff has put forward the Zaitlen declaration to support plaintiff's contention that the pre-existing factual record amply demonstrates that plaintiff has prosecuted his patents reasonably and so that defendant's argument that plaintiff has unreasonably delayed in his prosecution must fail. Zaitlen's credentials as a patent attorney and former PTO official qualify him to opine on the reasonableness of plaintiff's prosecution under the circumstances of the prosecution of these patents as explained to him by plaintiff. Citing his familiarity with PTO practices, gained both as a PTO examiner and as a lawyer experienced in patent practice, Zaitlen concludes that plaintiff's version of events, if true, supports the conclusion that plaintiff did not act unreasonably in prosecuting the patents at issue. Defendant advances no persuasive argument that Zaitlen is not qualified, based on training and experience, to present this conclusion to the court as admissible expert testimony, pursuant to FRE 702 and 703.

As a result, defendant has failed to demonstrate that the remainder of Zaitlen's declaration should be stricken pursuant to Civ LR 7–5 or FRCP 56(e). This conclusion is further buttressed by the fact that the court has discretion to allow a party opposing a summary judgment motion some leeway in presenting evidence under FRCP 56(e). See *School Dist. No. 1J*, 5 F.3d at 1261. Defendant's motion to strike the remaining portions of the Zaitlen declaration is DENIED.

Defendant's motion to strike the Zaitlen declaration (Doc # 420) is therefore GRANTED IN PART and DENIED IN PART. Paragraph 4 of the Zaitlen declaration (Doc # 409) is STRICKEN; the remainder of the Zaitlen declaration is admissible as expert testimony on the issue whether, if plaintiff's version of the prosecution history of the patents at issue is true, plaintiff's prosecution of those patents was reasonable.

## IV

■ Pursuant to FRCP 56(f), plaintiff has moved for leave to take discovery from defendant on two issues plaintiff identifies as germane to the court's analysis of defendant's prosecution laches motion: whether defendant can establish any intervening rights and whether defendant has unclean hands because it has infringed plaintiff's patents willfully. Doc # 406.

If a party opposing a motion presents the court with an affidavit or affidavits setting forth the reasons that party cannot present additional affidavits containing facts essential to justify that party's opposition, FRCP 56(f) authorizes the court "[to] refuse [an] application for judgment or [ ] order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had." *Id.*

"A Rule 56(f) motion must be brought before the summary judgment hearing." *United States v. Kitsap Physicians Service*, 314 F.3d 995, 1000 (9th Cir.2002) (citing *Ashton–Tate Corp. v. Ross*, 916 F.2d 516, 520 (9th Cir.1990)). The party seeking relief under FRCP 56(f) must show that (1) it has provided an affidavit identifying the specific facts it hopes to elicit from further discovery; (2) those facts exist; and (3) those facts are essential to resist summary judgment. See *State of California v. Campbell*, 138 F.3d 772, 779 (9th Cir.1998). "Failure to com-

ply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment." *Id.* (internal citation omitted); see also *Weinberg v. Whatcom County,* 241 F.3d 746, 751 (9th Cir.2001); *Kitsap,* 314 F.3d at 1000.

As an initial matter, the court is concerned with the adequacy of the declaration—or more properly, the portion of a declaration—plaintiff has filed to justify a FRCP 56(f) motion. In several paragraphs of his twenty-fifth declaration, plaintiff states that because of "[defendant's] complete refusal to respond to my interrogatories which are relevant to issues dispositive of [defendant's] present [prosecution laches] motion [ ], * * * I cannot present by affidavit facts essential to be taken and discovery to be had to refute [two] false allegations in [defendant's prosecution laches] memorandum." 25th Reiffin Decl (Doc # 408), ¶ 196. The purportedly false statements relate to plaintiff's alleged practice of amending his patent applications to cover subsequently developed technology, including defendant's products. See *id.* Plaintiff also complains that defendant failed to respond to interrogatories requesting information on defendant's products that contain spell checking or other multithreading functions or requesting opinions of counsel relating to a variety of issues relating to "patentability, novelty, validity, state-of-the-art, enforceability, or infringement with regard to the subject matter of the patents [at issue]." *Id.,* ¶¶ 197–98.

From these assertions, the court is supposed to infer that plaintiff is entitled to additional discovery on the issues of any adverse intervening rights of defendant to the subject matter of the patents or defendant's unclean hands in seeking equitable relief by its prosecution laches motion. See Pl FRCP 56(f) Mot (Doc # 406) at 1. The court does not see how the statements

in the twenty-fifth Reiffin declaration identify specific facts plaintiff hopes to elicit from further discovery, show that those facts exist or show that those facts are essential to resist summary judgment. See *Campbell,* 138 F.3d at 779.

Moreover, as the court discusses in greater detail below, the issues of intervening rights and unclean hands are irrelevant to the court's equitable determination regarding prosecution laches. Prosecution laches relates to the conduct of plaintiff in the prosecution of his patents, prior to the issuance of any patent. Whether defendant has acquired rights adverse to plaintiff's or has willfully infringed plaintiff's patents, once issued, has no bearing on the question whether plaintiff unreasonably and inexplicably delayed in the prosecution of the patent applications that ultimately resulted in the issuance of the patents here at issue. Plaintiff cannot, therefore, demonstrate that further discovery on either of these issues is essential for him to resist summary judgment. Facts not relevant to an issue cannot help plaintiff prevail on that issue.

Because plaintiff has failed properly to comply with the requirements of FRCP 56(f) and because the information on which plaintiff seeks discovery is not relevant to the issue of prosecution laches, plaintiff's FRCP 56(f) motion (Doc # 406) is DENIED.

## V

Having disposed of these preliminary matters, the court now turns to the substance of defendant's motion for summary judgment due to prosecution laches. Doc # 370. The heart of the issue of prosecution laches is the history of the prosecution of the patents at issue. It is with that history that the court begins.

### A

Plaintiff filed his initial patent application, entitled "Computer System with Real–Time Compilation," on September 28, 1982. See Weinstein Decl (Doc # 370, Exh C). The invention for which plaintiff sought a patent by this application was a method of compiling or editing computer source code with the execution of a compiler so that compilation of the source code could be "performed in real-time as the source code is entered or edited by the programmer," thereby improving the speed and efficiency with which program instructions in higher-level programming languages could be translated into lower-level object code. *Id.* at 2. This process is discussed in considerable detail above and in the court's claim construction order. See Doc # 365.

A continuation application was filed in 1985. See Weinstein Decl (Doc # 370, Exh D). Both the 1982 application and the 1985 applications overcame a series of rejections by the PTO, were the subject of appeals to the Board of Patent Appeals and Interferences (Board) and petitions to the Patent Office Commissioner (Commissioner).

On January 5, 1990, the PTO informed plaintiff that a patent would issue based on the 1982 application provided that plaintiff submitted additional formal drawings within three months time and paid the issuance fee. See Weinstein Decl (Doc # 370, Exh E) Instead of taking these steps that would have resulted in the issuance of a patent on the 1982 application, plaintiff abandoned that application in favor of another. Plaintiff's abandonment of the 1982 application was formally acknowledged by the PTO on March 21, 1991. See Weinstein Decl (Doc # 370, Exh F).

In March 1991, the PTO also notified plaintiff that a patent would issue on the 1985 continuation application. See Weinstein Decl (Doc # 370, Exh G). Plaintiff, however, attempted to withdraw his application rather than allow a patent to issue. See Weinstein Decl (Doc # 370, Exh H). The PTO dismissed plaintiff's petition to withdraw his application on May 20, 1991, thereby paving the way for a patent to issue. See Weinstein Decl (Doc # 370, Exh I). Plaintiff, however, failed to pay the issuance fee. Due to this failure, the PTO declared the 1985 continuation application abandoned. See Weinstein Decl (Doc # 370, Exh J).

A year earlier, in March 1990, plaintiff filed a second application for a patent under the same name as the original 1982 application, which plaintiff asserted was a continuation of the original application. See Weinstein Decl (Doc # 370, Exh K). There followed a series of amendments until October 1990. On May 15, 1992, the PTO allowed 29 of plaintiff's proposed claims, rejecting the others. See Weinstein Decl (Doc # 370, Exh N). In August 1992, plaintiff changed the title of the 1990 application, added nine claims, canceled nine previous claims and amended several additional claims. See Weinstein Decl (Doc # 370, Exh O). The PTO rejected plaintiff's new claims.

On January 15, 1993, plaintiff appealed the rejection of these nine claims to the Board. See Weinstein Decl (Doc # 370, Exh R). Plaintiff ultimately canceled five of the nine appealed claims and received an allowance for one. See Weinstein Decl (Doc # 370, Exh S). At that point, three rejected claims remained disputed on appeal. On October 5, 1994, the Board reversed the rejection of two of these remaining three disputed claims, rejecting the last based on newly discovered prior art. See *id.*

Plaintiff appealed the rejection of this final claim to the Federal Circuit. On September 1, 1995, the Federal Circuit remanded plaintiff's prosecution to the

PTO to provide plaintiff the chance to distinguish the remaining disputed claim from the newly discovered references cited by the Board in its October 1994 decision rejecting that claim. See Weinstein Decl (Doc # 370, Exh T).

In response to the Federal Circuit's decision, plaintiff filed an amendment after remand on September 12, 1995, in which he amended the title to the application, canceled the claims contained in the 1990 application and sought to proceed on a set of new and revised claims. See Weinstein Decl (Doc # 370, Exh U). Those substituted claims, as later amended and supplemented, became the claims of the '603 patent.

The '604 patent issued as the result of a continuation application from the 1990 application filed on March 25, 1994. See Weinstein Decl (Doc # 370, Exh V). Both the '603 and '604 patents issued on December 2, 1997.

From September 1982 to December 1997, plaintiff appealed decisions of the PTO three times and filed ten petitions. See 25th Reiffin Decl (Doc # 408), ¶ 11. The four patent applications were reviewed by three different patent examiners in all. See *id.*

### B

In a recent decision, *Symbol Technologies, Inc. v. Lemelson Medical,* 277 F.3d 1361 (Fed.Cir.2002), the Federal Circuit affirmed the equitable defense of prosecution laches. The *Symbol* court identified the "sole issue [it was addressing] on appeal [as] whether, as a matter of law, the equitable doctrine of laches may be applied to bar enforcement of patent claims that issued after an unreasonable and unexplained delay in prosecution even though the applicant complied with the pertinent statutes and rules." *Id.* at 1363. Although it is clear from *Symbol* that the answer to this question is affirmative, the *Symbol* court did little to clarify the elements of the defense, its scope or the burden of proof required to demonstrate it.

A subsequent opinion of the Federal Circuit, *In re Bogese II* (*Bogese II* ), 303 F.3d 1362 (Fed.Cir.2002), addresses some of the questions left open in *Symbol.* The *Bogese II* court characterized the holding of *Symbol* as follows: "that a patent may be rendered unenforceable if it was obtained after an unreasonable and unexplained delay in prosecution." *Id.* at 1367. At a minimum, then, an "unreasonable and unexplained delay" in prosecution is the identifying characteristic of a patent application against which a defendant may successfully assert the defense of prosecution laches.

The doctrine of prosecution laches as applied to patents received early articulation in an 1858 decision of the Supreme Court. See *Kendall v. Winsor,* 62 U.S. (21 How.) 322, 16 L.Ed. 165 (1858). In *Kendall,* the Court enunciated the principle that an inventor "may forfeit his rights as an inventor by a wilful or negligent postponement of his claims, or by an attempt to withhold the benefit of his improvement from the public until a similar or the same improvement should have been made and introduced to others." *Id.* at 329.

Drawing on this language, the Supreme Court fleshed out the doctrine in two decisions issued in the 1920s. In *Woodbridge v. United States,* 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159 (1923), the Court addressed the rights of a patent-holder in the following situation. On April 15, 1852, the Patent Office ordered the issuance of a patent to Woodbridge for an invention relating to the construction of rifles. See *id.* at 52, 44 S.Ct. 45. At the same time, pursuant to then-existing Patent Office rules, the Patent Office agreed to place Woodbridge's application in the Patent Office's

secret archives for a period of one year before issuing the patent. See *id.* at 52–53, 44 S.Ct. 45. Nine and one half years then passed before Woodbridge took any further step to act on his application. See *id.* at 53, 44 S.Ct. 45. By his own admission, Woodbridge neglected the application during that time because no "immediate opportunity of rendering [the patent] pecuniarily available [had] occurred" in the intervening years. *Id.* (internal quotation marks omitted).

Under these circumstances, the Supreme Court sustained the Court of Claims' determination that Woodbridge was barred from prosecuting his patent due to delay. "This is not a case of abandonment," wrote the Court, "It is a case of forfeiting the right to a patent by designed delay. * * * [T]here may be forfeiture by delay or laches and this court has said there may be such a forfeiture." *Id.* at 56–57, 44 S.Ct. 45 (citing *Kendall*, 62 U.S. at 329). "[O]ur conclusion rests, not on neglect and intention to give up the patent, but on a deliberate and unlawful purpose to postpone the terms of the patent the inventor always intended to secure." *Id.* at 59, 44 S.Ct. 45. "The gist of the reason for [this] conclusion [is] that the purpose and the result of the conduct of the inventor [was] to postpone the time when the public could enjoy the free use of the invention." *Id.* at 60, 44 S.Ct. 45.

The *Woodbridge* Court identified two substantive policies served by the doctrine of prosecution laches: (1) preventing a patent applicant from deliberately delaying the issuance of a patent the applicant "always intended to secure" solely to increase the commercial value of the patent; and (2) preventing a patent applicant from unreasonably postponing "the time when the public could enjoy the free use of [an] invention" that would otherwise have been made available to the public at a much earlier date.

The Court extended the doctrine to cover divisional applications in *Webster Electric Co v. Splitdorf Electrical Co*, 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792 (1924). In *Webster,* the court addressed "a case of unreasonable delay and neglect on the part of the applicant and his assignee in bringing forward claims broader than those originally sought." *Id.* at 465–66, 44 S.Ct. 342. In such a case, the court had "no hesitation in saying that the delay was unreasonable, and, under the circumstances shown by the record, constitutes laches, by which the petitioner lost whatever rights it might otherwise be entitled to." *Id.* at 466, 44 S.Ct. 342. The court went on to conclude that "in cases involving laches, equitable estoppel or intervening private or public rights, the [then applicable] two-year time limit [in presenting an application] prima facie applies to divisional applications and can only be avoided by proof of special circumstances justifying a longer delay." *Id.* at 471, 44 S.Ct. 342.

In two 1938 decisions, the Court limited the scope of the *Webster* holding. Those decisions address the relevance of the two-year time limit on the presentation of patent applications to the doctrine of prosecution laches for the prosecution of divisional applications. See *Crown Cork & Seal Co. v. Ferdinand Gutmann Co.*, 304 U.S. 159, 58 S.Ct. 842, 82 L.Ed. 1265 (1938); *General Talking Pictures Corp. v. Western Electric Company*, 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273 (1938). In those decisions, the court clarified that the lapse of the two-year time limit does not by itself demonstrate prosecution laches. "[I]n the absence of intervening adverse rights, the decision in [*Webster*] does not mean that an excuse must be shown for a lapse of more than two years in presenting the divisional application." *Crown Cork*, 304 U.S. at 167–68, 58 S.Ct. 842; see *General Talking Pictures*, 304 U.S. at 183, 58 S.Ct. 849 ("In the absence of intervening ad-

verse rights for more than two years prior to the continuation applications, they were in time").

A 1935 decision of the First Circuit Court of Appeals further clarifies the dimensions of the doctrine. In *Utah Radio Products Co. v. Boudette*, 78 F.2d 793 (1st Cir.1935), the First Circuit distinguished prosecution laches from abandonment. "This is a case of laches, not abandonment. To prove abandonment it is necessary to show an intention on the part of the inventor to abandon or give the subject-matter to the public; but where laches—unreasonable delay—is the issue, the intent is unimportant, and especially so where rights have attached pending the delay." *Id.* at 799. The *Utah Radio Products* decision suggests that the reasonableness of a delay is to be measured not by the patent applicant's subjective intent with respect to his application, but rather by some objective measure of reasonableness that can be applied without regard to the applicant's actual attitude toward the patents or patent applications at issue. This point was later taken up by the *Symbol* court, which held that an applicant who complies with all pertinent statutes and rules regarding his patent application can nonetheless be barred from enforcing his patents by the doctrine of prosecution laches. See *Symbol*, 277 F.3d at 1363.

If, as *Symbol* and *Bogese II* make plain, the prosecution laches defense has survived the many changes in patent law since the first full articulation of the doctrine in 1923, the questions remain, (1) what form does the prosecution laches defense presently take, (2) what is the burden of proof required to prove prosecution laches, and (3) is prosecution laches an issue susceptible to resolution by summary judgment.

Since *Symbol*, district courts that have addressed the question what elements constitute the prosecution laches defense have reached overlapping, but not identical, con-clusions. At a minimum, it is clear that "*Symbol* requires a court to examine whether delay [in prosecution of an original or divisional patent application] is unreasonable and unexplained." *Digital Control Inc. v. McLaughlin Manufacturing Co., Inc.*, 225 F Supp 2d 1224, 1228 (W.D.Wash.2002). The *Digital Control* court, in fact, found this to be the sum total of the inquiry the court must make: "In accordance with *Symbol*, this Court on summary judgment determines if, as a matter of law, the equitable doctrine of laches may be applied to bar enforcement of the patent claims at issue because of Plaintiff's unreasonable and unexplained delay in the prosecution." *Id.* at 1229.

In *Intuitive Surgical, Inc. v. Computer Motion, Inc.*, 2002 WL 31833867 (D.Del. 2002), a court in the District of Delaware reached a somewhat different conclusion. That court articulated a two-part analysis: "First, a threshold inquiry must be undertaken as to whether a patent obtained after an unreasonable delay in prosecution. * * * Second, in reviewing the record to determine whether the delay at issue was unreasonable and unexplained, the court must consider the fact that prosecution laches is an equitable tool which has been used sparingly in only the most egregious cases." *Id.* at *3 (internal quotation marks and citations omitted).

Other district courts have also interpreted the test for prosecution laches as a two-part test, but identified a different second part. See *Cummins–Allison Corp. v. Glory Ltd.*, 2003 WL 355470 (N.D.Ill.2003); see *Chiron Corporation v. Genentech, Inc*, 268 F.Supp.2d 1139 (E.D.Cal.2002) (applying the two-part test described below, but acknowledging that "[t]he parties are in agreement that both of these elements must be established for [defendant] to prevail on its defense"). "Under [the doctrine of prosecution laches], the holder of a valid

patent nonetheless may be barred from enforcing it if there was an unreasonable and unexplained delay in prosecuting the patent claim, and the alleged infringer has suffered prejudice as a result." *Cummins–Allison*, 2003 WL 355470 at *40. Lacking further guidance from the Federal Circuit regarding the elements specific to the defense of prosecution laches, these two courts borrow the second element from an arguably analogous context. The second element invoked by the *Cummins–Allison* and *Chiron* courts parallels the second element of traditional laches. Traditional laches requires an unreasonable and inexcusable delay in prosecution and material prejudice to the alleged infringer attributable to that delay. See *A.C. Aukerman v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed.Cir.1992).

Another of "the many unsettled questions of law regarding prosecution laches is the burden of proof required to establish prosecution laches. One district court has held that 'since the application of this doctrine would render a patent unenforceable, the moving party must provide clear and convincing evidence.'" *Intuitive Surgical*, 2002 WL 31833867, at *5 n. 4 (quoting *Gen–Probe Inc v. Vysis, Inc*, No 99–CV–2668H (SD Cal Aug 5, 2002) (post-trial order); further internal citations omitted). The *Intuitive Surgical* court, however, concluded that the more appropriate burden of proof was that applicable "in equitable laches and estoppel cases," namely the preponderance of the evidence. *Id.*

Both parties acknowledge that prosecution laches is an equitable defense and therefore an issue appropriately decided by the court. See Pl Supp Memo (Doc # 439) at 2; Def Supp Memo (Doc # 438) at 2. The parties agree, therefore, that the court could, under the right circumstances, grant a motion for summary judgment based on prosecution laches.

This conclusion is in keeping with other decisions of the Federal Circuit regarding equitable defenses. See, e g, *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1318 (Fed.Cir.2000) ("The defense of inequitable conduct is entirely equitable in nature, and thus not an issue for a jury to decide;" internal citations omitted); *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed.Cir.1995) ("Being an equitable doctrine, estoppel is committed to the sound discretion of the trial judge * * *;" internal citations omitted); *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1292 (Fed.Cir.1992) ("Laches and estoppel are equitable defenses, committed to the sound discretion of the trial court;" internal citation omitted); *Aukerman*, 960 F.2d at 1028 ("As equitable defenses, laches and equitable estoppel are matters committed to the sound discretion of the trial judge * * *"). It is also in keeping with the practice of district courts that have decided motions for summary judgment due to prosecution laches after *Symbol.* See *Digital Control Inc.*, 225 F Supp 2d at 1225; *Stambler v. RSA Security, Inc.*, 243 F.Supp.2d 74, 74–75 (D.Del.2003); *Chiron*, 268 F.Supp.2d at 1140–41, 2002 WL 32124006, at *1–*2

If the defense of prosecution laches is a matter that can be resolved on summary judgment, the court's determination of that issue must be guided by the usual standards governing summary judgment, which the court has already discussed above. See *Hemstreet*, 972 F.2d at 1292; *Aukerman*, 960 F.2d at 1028. With respect to the equitable defenses of laches and equitable estoppel, the Federal Circuit has established that "both defenses ultimately turn on underlying factual determinations. Summary judgment thus is appropriate only when there is no genuine issue of material fact and when the movant is entitled to judgment as a matter of law."

*Id.*; see *Aukerman,* at 1037–38, 1041; see *Winner Int'l Corp. v. Wolo Mfg. Corp.,* 905 F.2d 375, 376 (Fed.Cir.1990).

█ Based on a review of the cases just discussed, the court concludes that there is but one element of the defense of prosecution laches that defendant must prove to prevail on this issue: that plaintiff unreasonably delayed in the prosecution of his patents in a manner that cannot be reasonably explained. Although the *Symbol* court used the phrase "unreasonable and unexplained delay" to describe the circumstances in which a determination of prosecution laches is appropriate, the term "unexplained" simply qualified what counts as reasonable conduct in the prosecution of a patent.

Even the most unreasonable conduct in the prosecution of a patent can be explained in some fashion. *Woodbridge* offers the quintessential example of an explanation that fails the test of reasonableness. Asked to explain the delay in the prosecution of a patent application that had been sitting in the secret archives of the patent office gathering dust for close to ten years, Woodbridge baldly replied, "I have allowed [the application] to remain until the present time, it being only lately that any immediate opportunity of rendering it pecuniarily available has occurred." *Woodbridge,* 263 U.S. at 52, 44 S.Ct. 45. The fact that his patent application had not been profitably marketable for close to ten years, while it explains Woodbridge's decision not to act on the application does not render that decision reasonable. The doctrine of prosecution laches is grounded in the need to strike an appropriate balance between the public's interest in encouraging invention with the public's competing interest in "the free public enjoyment of the useful invention." *Id.* at 56, 44 S.Ct. 45. It is an objective measure of reasonableness,

applied to a patent applicant's explanation for his delay, that determines whether that delay is legitimate. See *Utah Radio Products,* 78 F.2d at 799 ("[B]ut where laches—unreasonable delay—is the issue, the [applicant's subjective] intent is unimportant"). The applicant's pecuniary interest in the patent cannot by itself make an otherwise unexplained delay in prosecution reasonable.

It is this last feature of prosecution laches, as applied to the prosecution of patent applications, that distinguishes it from traditional laches, "defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *Aukerman,* 960 F.2d at 1028–29 (internal citation omitted). "Laches is a clement doctrine. It assures that old grievances will some day be laid to rest, that litigation will be decided on the basis of evidence that remains reasonably accessible and that those against whom claims are presented will not be unduly prejudiced by delay in asserting them." *Environmental Defense Fund v. Alexander,* 614 F.2d 474 (5th Cir.), *cert denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980); *Aukerman,* 960 F.2d at 1029. Because traditional laches in the patent context involves a failure by a plaintiff to remedy an alleged wrong committed by a specific defendant, a separate element of the defense of laches is the demonstration by defendant that plaintiff's delay in filing suit operated to prejudice or otherwise harm that specific defendant. See *Aukerman,* 960 F.2d at 1032 (citing *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Meyers v. Brooks Shoe, Inc.,* 912 F.2d 1459, 1461 (Fed.Cir.1990); *Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570, 1572 (Fed.Cir.1987)).

Prosecution laches, as the term suggests, involves a different kind of delay that occurs at a different time in the patent process: an unreasonable and unexplained delay in the prosecution of a patent application prior to the issuance of the patent. The differences between delaying prosecution of a patent and delaying filing suit against a specific defendant underscore the differences in the goals of the two equitable defenses. The goals of prosecution laches, as articulated in *Woodbridge,* are twofold: to block a patent applicant from (1) unreasonably delaying the issuance of a patent and attendant publication of an invention for the purpose of maximizing its commercial value and (2) "depriv[ing] the public of free use of the patent which the law intended" for a period of time in excess of the monopoly period already provided by the patent laws. In other words, prosecution laches prevents patent applicants from "unduly postpon[ing] the time when the public [can] enjoy the free use of the invention" by strategically delaying the issuance of the patent to their own commercial advantage. *Woodbridge,* 263 U.S. at 58, 60, 44 S.Ct. 45. Prosecution laches is not a doctrine, like traditional laches, aimed to protect specific competitors. It rather serves the broader public interests in the timely issuance of patents. Because prosecution laches applies to the conduct of a patent applicant prior to the issuance of a patent, the doctrine cannot be aimed at protecting specific infringers or potential infringers from prosecutorial delay, because there can be no infringement until a patent has issued.

Although written in dissent, a remark of Judge Newman in *Bogese II* is applicable here. "[P]atent examination is not litigation; there is no 'defendant,' no prejudice, no issue of injury to the government or clean hands on [the government's, i e, the PTO's] part." *Bogese II,* 303 F.3d at 1372 (Newman, J, dissenting). Judge Newman argued that the absence of a defendant

should bar the PTO, as an arm of the government, from applying the doctrine of prosecution laches. That was not, however, the holding of the Federal Circuit in *Bogese II.* If prosecution laches is a doctrine that may be invoked both by officers of the PTO during the application process and by defendants in patent infringement litigation, then the doctrine must exist to support a policy or policies other than the protection of particular competitors of a patent applicant who might be harmed by undue delay.

■ As a result, the elements of prosecution laches must be comparably distinguishable from those of traditional laches. A defendant seeking to raise a prosecution laches defense need not prove specific harm or prejudice to itself successfully to make the case for prosecution laches. Nor does the issue of a defendant's unclean hands have any bearing on the policies promoted by the prosecution laches defense. It is the history of plaintiff's prepatent prosecution, not defendant's post-patent conduct (or misconduct) that is relevant to the court's determination of prosecution laches.

These conclusions leave the demonstration of unreasonable and unexplained delay the sole element of the defense of prosecution laches. While the test of reasonableness is objective, the inquiry remains fact-intensive and must include consideration of the circumstances of the plaintiff as patent prosecutor. In these respects, the test the court must employ is similar to that employed in an equally fact-intensive, but otherwise quite different, context: the test whether police conduct constitutes a seizure within the meaning of the Fourth Amendment. That test measures whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" an encounter with a police officer.

See *INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J)). The reasonable person standard is "an objective standard, looking to the reasonable [person's] interpretation of the conduct in question." *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). That standard "ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached." *Id.*

■ The standard required for the determination of prosecution laches is much the same. The court must evaluate how a reasonable patent applicant would prosecute his patent under plaintiff's circumstances. The inquiry is not directed at plaintiff's subjective attitude toward the prosecution. As the Federal Circuit made clear in *Symbol*, the issue is not whether an applicant complied with the applicable regulations and statutes. *Symbol*, 277 F.3d at 1363. Compliance is not determinative of reasonableness. Reasonableness, rather, depends on whether any delay in the prosecution of a patent application can be explained by reference to the legitimate considerations and/or expectations of a reasonable patent applicant. Relevant considerations may include whether (1) the prosecution history of plaintiff's patents was typical of patents in that field or patents generally; (2) any unexplained gaps exist in the prosecution history; (3) plaintiff took any unusual steps to speed or delay the application process; (4) the PTO or other reviewing body took any unusual steps to speed or delay the application process; (5) plaintiff took any steps to limit public awareness of his pending applications or the inventions he sought to patent over the course of the prosecution; (6) any changes in plaintiff's prosecution of the application coincide with or directly follow evolutions in the field that relate to the claimed invention; and (7) legitimate grounds can be identified for the abandonment of prior applications.

■ With regard to the burden of proof, the court concludes that the burden of proof on a defendant raising the defense of prosecution laches should be no higher than that required to raise other equitable defenses in patent cases, including traditional laches. "The issue of laches concerns delay by one party and harm to another. Neither of these factors implicates the type of special considerations which typically trigger imposition of the clear and convincing standard of proof. * * * Accordingly, we hold that 'preponderance of the evidence' is the appropriate evidentiary standard to establish the facts relating to the laches issue." *Aukerman*, 960 F.2d at 1045. The Federal Circuit's reasoning regarding the burden of proof appropriate to traditional laches can be readily transferred to the context of prosecution laches. Although the court has concluded that harm to the other party is not relevant to the court's prosecution laches analysis and that unreasonable and unexplained delay is the sole factor to be considered, that difference does not warrant the application of a different standard of proof. Both prosecution and traditional laches are equitable bars to enforcement, not statutory grounds for a finding of invalidity. As such, the presumption of validity that requires the adoption of a higher burden of proof of patent invalidity should not apply to the presentation of these defenses.

The clear and convincing standard of proof is more typically used "in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. * * * Similarly, [the Federal Circuit] has used the 'clear, unequivocal and convincing' standard of proof to protect particularly important individual interests

in various civil cases." *SSIH Equipment SA v. U S Intern. Trade Com'n,* 718 F.2d 365, 380–81 (Fed.Cir.1983). Although prosecution laches differs from traditional laches with respect to its elements, that difference does not provide any ground for the imposition of a different burden of proof on a defendant advancing the former defense as opposed to the latter. The court agrees with the reasoning of the *Intuitive Surgical* court that the analogy between the harms traditional and prosecution laches exist to prevent is adequate to justify the application of the same standard of proof in each kind of case. See *id.* at *5 n. 4.

In order to prevail on summary judgment, then, defendant must demonstrate, by a preponderance of the evidence, that there is no genuine dispute of material fact regarding the prosecution history of the patents at issue that would permit the fact finder to conclude that plaintiff acted reasonably in prosecuting the applications that ultimately resulted in the issuance of the '603 and '604.

### C

Defendant asserts that the factual record presents "the textbook case for prosecution laches." See Def Pros Laches Memo (Doc # 370) at 15. Defendant argues that the '603 and '604 patents "present egregious examples of 'submarine patenting,'" i e, artificially extending the period of time of prosecution of patent applications so that the patents that eventually issue cover the subsequent products of competitors working in the same area. Def Pros Laches Memo (Doc # 370) at 1. Plaintiff's goal in so delaying prosecution was, defendant argues, to bring as many subsequent technological advances within the scope of his patents as possible, thereby increasing their value at the expense of subsequent inventors who would, until a patent issued for plaintiff's invention, remain largely or wholly unaware of the content of plaintiff's pending patent applications.

Defendant points particularly to plaintiff's abandonment of the 1982 and 1985 applications just prior to the time patents were to issue from those applications as instances of designed delay that cannot otherwise be reasonably explained. Defendant accuses plaintiff of similar misconduct with respect to the 1990 application, which plaintiff substantially altered just after winning approval of all but one of nine claims the rejection of which he had contested to the Board and the Federal Circuit.

As a result of this deliberate manipulation of the application process, defendant contends, the claims that form the basis for plaintiff's suit against defendant did not enter plaintiff's applications until 1994 and 1995, more than eleven years after the filing date of the 1982 application. Defendant contends that plaintiff cannot both (1) credibly maintain that the roots of the allegedly infringed claims can be traced to the 1982 application, and (2) credibly explain his failure to include those claims at some point during the course of the prosecution of the 1982 application before 1994 or 1995.

Contrary to defendant's characterization, the prosecutorial history of the '603 and '604 patents do not represent a "textbook case" of prosecution laches. That textbook case, if one exists, involves a patent application filed and then followed by a lengthy period of unexplained *inactivity.* See, e.g., *Woodbridge,* 263 U.S. at 56, 44 S.Ct. 45 ("In this case we have a delay of 9½ years in securing a patent that might have been had at any time in that period for the asking.").

What defendant asks the court to conclude here is, in effect, that plaintiff's *hyperactivity* in the prosecution of his applications was part of a deliberate plan to

maintain the prosecution of those applications for as long a time as possible without allowing patents to issue. While the court does not discount the possibility that under some circumstances a defendant might be able to meet its burden to demonstrate prosecution laches based on such an argument, the court cannot here conclude that this defendant is entitled to summary judgment on prosecution laches based on the evidence currently available.

Drawing reasonable inferences from the factual record in favor of plaintiff, that record demonstrates that there are genuine issues of material fact whether plaintiff's prosecution of the 1982, 1985, 1990 and 1994 applications, although lengthy, was reasonable.

As plaintiff notes, a significant portion of the time plaintiff spent prosecuting his applications was spent awaiting responses from the PTO. See 25th Reiffin Decl (Doc # 408) at 4, ¶ 11. This fact alone cannot, as a matter of law, dispose of defendant's contention. The Federal Circuit, in *Bogese II*, explained that "a delay by the PTO cannot excuse the appellant's own delay." *Id.* at 1369. And the *Symbol* court clearly specified that prosecution laches may occur "even though the patent applicant complied with pertinent statutes and rules." *Id.* at 1363. The fact that plaintiff's applications spent much of their time pending before the various patent examiners, the Board or the Federal Circuit nevertheless demonstrates that plaintiff was not wholly the master of the prosecution.

Moreover, plaintiff points to a number of occasions on which he made inquiries with the PTO to ascertain when an office action on his applications would be forthcoming or otherwise attempted to expedite proceedings by prompting PTO action by appropriate means. See 25th Reiffin Decl (Doc # 408), at 10, ¶ 16; 40, ¶ 133; 42, ¶ 146; 45–46, ¶ 170; at 46, ¶¶ 176–77.

Defendant focuses on two critical junctures in the prosecution to argue that plaintiff's conduct of the prosecution was designed to delay proceedings: (1) the filing of the 1990 application around the time of the abandonment of the 1982 and 1985 applications and (2) the amendment and/or cancellation of existing claims once those claims had survived appeal to the Board and the Federal Circuit. Plaintiff's explanation for both of these decisions is his dissatisfaction with the PTO's examination of his applications up to that point. With regard to the abandonment of the 1982 and 1985 applications and initiation of a new but related application, plaintiff asserts that the history of the examination gave him little confidence that the patents that might issue from the 1982 and 1985 applications would cover what plaintiff believed to be the legitimate scope of his invention. See 25th Reiffin Decl (Doc # 408) at 6, ¶ 12(c). Plaintiff believed at the time that any patent that would issue from those applications would not have accurately reflected the invention claimed. In support of this claim, plaintiff points to the fact that subsequent examiners discovered and cited twelve new prior art references after taking over the examination. See *id.* Plaintiff also notes that the examiner changed the titles to both the 1982 and 1985 applications in ways plaintiff believed unnecessarily narrowed the scope those claims would otherwise have been accorded. See *id.* Additionally, plaintiff became aware at around the same time of new terminology—"thread" and "multithread"—that plaintiff believed might usefully be applied to the inventions he was seeking to patent. See *id.*

Defendant insists that these arguments are disingenuous, because if plaintiff knew of pertinent art that was not being considered by the examiner he had a duty to bring that art to the examiner's attention. See 37 CFR § 1.56; MPEP § 2000 *et seq.*

But plaintiff does not assert that he knew of pertinent art and failed to disclose it to the examiner. Rather his claim is that, based on the remoteness in time of the prior art cited by the examiner of the 1982 application, plaintiff feared that it was not the most pertinent prior art in existence at the time. That concern might justify the abandonment of a pending patent application in favor of a new one. The mere fact that plaintiff chose to abandon the 1982 and 1985 applications, while certainly necessitating some delay in the issuance of the patent, does not itself demonstrate that plaintiff was attempting *unreasonably* to delay the issuance of any patent deriving from those applications.

Defendant further insists that plaintiff's avowed concern that the patents that would have issued from the 1982 and 1985 applications would have had "little, if any, presumption of validity" is nonsense. Defendant points out that the presumption of validity accorded issued patents does not differ from patent to patent. See 35 USC § 282. Although plaintiff's choice of words may be less than felicitous, the sense of those words is comprehensible, and indeed arguably reasonable. In essence, plaintiff's concern throughout was that his invention was being narrowed by the examiner—through changes to the name on the application, through required amendments and rejections based on prior art—to the point that any patent that did issue would no longer reflect plaintiff's invention as he understood it. The question for the court to consider is not whether the examiner was within his authority to act as he did—a point plaintiff does not contest—but rather whether it would be, under such circumstances, an unreasonable form of delay for a patent applicant in plaintiff's shoes to withdraw or otherwise abandon his application and attempt to start, as it were, afresh. The reasonableness of that decision does not turn on the legality of the examiner's conduct, but rather on the competing considerations facing plaintiff. Again, the court cannot conclude as a matter of law that the facts cannot support the conclusion that plaintiff acted reasonably in making the strategic decision to abandon his existing applications in favor of new ones. The inferences most favorable to plaintiff suggest that the choice was made not for the improper purpose of interposing needless delay in the issuance of the very patents plaintiff was seeking, but rather that the decision was made for the purpose of attempting to secure as favorable a result from the PTO as legitimately obtainable.

Defendant argues that this case closely resembles *Bogese II,* in which, during the course of the prosecution history, a patent applicant used a constant stream of continuation applications to keep alive claims on which a final resolution could have been reached much earlier. See *Bogese II,* 303 F.3d at 1364. The conduct disapproved by the PTO in *Bogese II,* was "Bogese's pattern of receiving a final rejection from the PTO, not amending his application or claims, filing a file wrapper continuation [required within six months of a final rejection to preserve the priority date of the original application] exactly or almost exactly six months later without any amendments, and abandoning his prior application." *Id.* This pattern, repeated eight times between 1989 and 1994, resulted in the PTO determining that the *Bogese II* applicant's prosecution was barred by the doctrine of prosecution laches. See *id.*

Unlike the circumstances of *Bogese II,* plaintiff's prosecution history does not demonstrate that plaintiff did only the minimum required of him to maintain his original priority date of 1982, but no more. Rather, plaintiff overcame a series of rejections by making substantive changes to the applications or by properly appealing those decisions. Plaintiff raised a number

of substantive issues regarding the patent applications on appeal both to the Board and the Federal Circuit. When he became eligible to do so based on his age, plaintiff filed a "petition to make special" with the PTO. See CFR 1.1.02(c); 25th Reiffin Decl (Doc # 408) at 35, ¶ 107; 43–44, ¶ 154. Such a petition allows the application of an applicant who is 65 or older to be considered on an expedited time schedule. Nor did plaintiff take frequent advantage of potential extensions of the period of time he was given to respond to office actions of the examiner, which is common practice among patent applicants. See 25th Reiffin Decl (Doc # 408) at 11, ¶ 20; see Zaitlen Decl (Doc # 409) at 5, ¶ 16.

The facts just recited, and inferences reasonably drawn from them in plaintiff's favor, could provide an adequate basis for a finding that plaintiff acted reasonably in prosecuting his patent applications and did not engage in an unreasonable and unexplained delay in prosecution. As a result, the court cannot conclude that summary judgment on the issue prosecution laches is warranted. Defendant's motion for summary judgment due to prosecution laches (Doc # 407) is DENIED.

The court notes, however, that this issue is ripe for determination at trial. There is no need for additional fact discovery. And any needed expert testimony, if not already provided in the form of declarations on file or depositions already taken, would be minimal. For these reasons, the court will conduct a trial limited to the issue of prosecution laches. A further case management conference is scheduled for May 29, 2003 at 3:30. At that conference, the court will set a schedule for a trial limited to the issue of prosecution laches.

## VI

Plaintiff has moved for leave to file a second amended complaint (SAC) naming additional products of defendant that alleg-

edly infringe the '603 and '604 patents. Doc # 436. Although the court has ordered summary judgment invalidating the '603 patent pursuant to 35 USC § 112, ¶ 1, plaintiff's motion for leave to file a SAC concerns claims of infringement of the '604 patent, which remains at issue. For that reason, the court now turns to plaintiff's motion for leave to file a SAC.

### A

In order more fully to address the question whether the court's March 30, 2001, order (Doc # 249) has preclusive effect on some claims stated in plaintiff's proposed SAC, each party has filed a miscellaneous administrative request, pursuant to Civ LR 7–10(b), for leave to file an additional brief addressing that narrow issue. Docs ## 446, 449. Neither request has been opposed. Given the narrow scope of the issue addressed and the assistance additional clarification of the issue affords the court, each party's miscellaneous administrative request for leave to file an additional brief (Docs ## 446, 449) is GRANTED.

### B

Federal Rule of Civil Procedure 15(a) provides that a party no longer permitted to amend its pleadings "as a matter of course * * * may amend the party's pleadings only by leave of court or by written consent of the adverse party." *Id.* "[L]eave shall be freely given when justice requires." *Id.* "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment etc.— the leave sought should, as the rules require, be 'freely given.' " *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d

222 (1962) (quoting FRCP 15(a)). Although a factor for the court to consider, undue delay is insufficient by itself to justify denying a motion to amend unless accompanied by a showing of prejudice to the nonmoving party. See *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 186 (9th Cir.1987); *Bowles v. Reade,* 198 F.3d 752, 757–58 (9th Cir.1999). "The party opposing amendment bears the burden of showing prejudice." *DCD Programs,* 833 F.2d at 187. Ultimately, the decision to grant or deny leave to amend rests with the discretion of the court. See *Swanson v. United States Forest Service,* 87 F.3d 339, 343 (1996).

Defendant's arguments fall into two categories: (1) arguments that plaintiff should not be permitted to amend the complaint to include certain specific products; and (2) arguments that plaintiff should not be permitted to amend the complaint in any fashion, because he has unduly delayed amendment in a manner prejudicial to defendant. The court addresses each type of argument in turn.

With respect to one set of defendant's products, defendant argues that amendment to include those products is barred by the court's March 30, 2001, order granting defendant's motion to dismiss in parallel proceedings originally commenced in the District Court for the District of Columbia and subsequently transferred to this court (*Reiffin II*). See Doc #249; *Reiffin v. Microsoft Corp.,* 158 F.Supp.2d 1016 (N.D.Cal.2001), *aff'd* 42 Fed.Appx. 464 (Fed.Cir.2002); see also *Reiffin v. Microsoft Corp.,* 104 F.Supp.2d 48 (D.D.C. 2000).

The amended complaint in *Reiffin II* alleged antitrust violations and patent infringement against six products of defendant not named in the first amended complaint (FAC) in this action (*Reiffin I*): Windows 2000, Word 2000, Excel 2000, Access 2000, Office 2000 and Publisher 2000 (Microsoft 2000 products). In its March 30, 2001, order, the court addressed motions pending in both *Reiffin I* and *Reiffin II.* The court dismissed infringement claims against both defendant and former co-defendant Harold Wegner in the complaint filed in *Reiffin II,* based in large measure on their similarity to the allegations of the FAC filed in *Reiffin I.* See *Reiffin I,* 158 F.Supp.2d at 1034. Dismissal was without prejudice as to claims against defendant alleging infringement of products not already named in the *Reiffin I* complaint and with prejudice as to claims against Wegner. See *id.*

The court further granted plaintiff leave to amend the complaint in *Reiffin I* to include any allegedly infringing products of defendant not yet named in that action. See *id.* The aim of the court was to allow plaintiff to bring all of his claims of infringement against any allegedly infringing product of defendant within the scope of a single ongoing action, *Reiffin I.* Plaintiff acknowledges that, rather than amend the *Reiffin I* complaint to include additional allegedly infringing products within the 30 days allotted, plaintiff chose to pursue an appeal of the court's decision in *Reiffin II* to the Federal Circuit. See Pl Rep (Doc #445) at 2. The dismissal of plaintiff's infringement claims in *Reiffin II* with leave to renew them as claims in a SAC in *Reiffin I* was not an issue raised by plaintiff on appeal in *Reiffin II.* See Weinstein Decl (Doc #444), Exh C.

Some confusion has arisen whether dismissal of the patent infringement claims in *Reiffin II* was with or without prejudice. This confusion has resulted in large measure from an error in the court's order entering judgment in *Reiffin II.* See *Reiffin II,* C 00–2221 VRW (Doc #82). In that order the court incorrectly stated that dismissal of plaintiff's infringement claims against defendant (as opposed to the

claims stated against Wegner) was with prejudice. See *id.* at 1. In a companion order issued in that case 00–2221 Doc # 94, the court has, pursuant to FRCP 60(a), corrected the judgment in *Reiffin II,* accurately to reflect the court's intention that dismissal of plaintiff's *infringement* claims against defendant in that action be without prejudice to their being reasserted in the instant action, *Reiffin I,* within 30 days of the issuance of the court's March 30, 2001, order.

Based in part on the error in the court's order entering judgment in *Reiffin II* (C 00–2221 VRW (Doc # 82)), defendant incorrectly asserts that the court's March 30, 2001, order dismissed plaintiff's infringement claims against Microsoft 2000 products with prejudice. In fact, as the plain text of the March 30, 2001, order demonstrates, the only claims dismissed with prejudice were claims against former codefendant Wegner. See *Reiffin I,* 158 F Supp 2d at 1034. Defendant's argument that plaintiff is accordingly barred from amending the complaint based on the claim preclusive effect of a dismissal with prejudice fails as a result of this misreading. See Def Opp (Doc # 443) at 3.

"A dismissal without prejudice opens the door to a renewed contest. A dismissal with prejudice brings the contest to a close." *Salveson v. Western States Bankcard Ass'n,* 731 F.2d 1423, 1432 (9th Cir. 1984); see *McGuckin v. Smith,* 974 F.2d 1050, 1053 (9th Cir.1992) *overruled on other grounds, WMX Technologies, Inc. v. Miller,* 104 F.3d 1133, 1136 (9th Cir.1997). Although the dismissal involved here was perhaps unusual, in that leave was granted to amend a complaint in a different pending action to include the claims dismissed, that unusual feature of the dismissal should not obscure the fact that leave was granted plaintiff to renew those claims in some fashion before this court. The further issue of plaintiff's failure to amend the complaint in *Reiffin I* within the 30 day time period provided by that order, therefore, goes not to the question whether plaintiff is barred altogether from reasserting these claims, but rather to the question whether plaintiff unduly delayed in prosecuting this action in a manner prejudicial to defendant. That issue is addressed in full below.

Defendant argues that plaintiff should not be permitted to reassert infringement claims against defendant's Windows CE product, which was named in the initial complaint but not the FAC. Ninth Circuit case law establishes that "[a]ll causes of action alleged in an original complaint which are not alleged in an amended complaint are waived." *King v. Atiyeh,* 814 F.2d 565, 567 (9th Cir.1987) (internal citation omitted). Although the object of some criticism, the rule is clear. See *Marx v. Loral Corp.,* 87 F.3d 1049, 1056 (9th Cir.1996). Plaintiff informs the court that the exclusion of Windows CE from the FAC was inadvertent and requests leave to correct this omission by amendment. See Pl Opp (Doc # 445) at 6 n *. It is plaintiff, however, who has failed to reallege claims of infringement of Windows CE in the FAC and plaintiff who must suffer the consequences: a waiver of those claims.

Unlike the other allegedly infringing products plaintiff seeks to introduce in a SAC, Windows CE was a product against which plaintiff had previously alleged infringement in this action and plaintiff's failure to reallege those claims cannot be attributed to any confusion regarding the court's disposition of *Reiffin II* or subsequent discovery of the infringement. Upon receiving the FAC, defendant had reason to believe plaintiff was dropping infringement claims against Windows CE and to plan its defense accordingly. In the case of this product, the prejudice to defendant of the reintroduction of claims

against Windows CE is more substantial and the explanation for delay offered by plaintiff less than compelling. With respect to claims of infringement against Windows CE, plaintiff's motion for leave to amend the complaint must be DENIED.

In order to prevail on its argument that plaintiff should be denied leave to amend the complaint to name any new allegedly infringing products of defendant, defendant must demonstrate both undue delay and prejudice. Defendant's case for undue delay is compelling. The court's March 30, 2001, order gave plaintiff 30 days in which to file an amended complaint in *Reiffin I* alleging infringement claims against products not already included in the first amended complaint in *Reiffin I*. Plaintiff failed to do so, choosing instead to proceed with an appeal in *Reiffin II* that neither foreclosed further proceedings in *Reiffin I* nor challenged the propriety of the court's determination to dismiss plaintiff's infringement claims in *Reiffin II*. Plaintiff's late attempt to amend his complaint must be analyzed in light of the missed opportunity to amend afforded by the court's March 30, 2001, order.

Moreover, the products plaintiff seeks to add in a SAC had been released by defendant well before the time plaintiff filed the motion to amend. They were products widely publicized and the existence of which would not have been difficult for plaintiff to establish. Indeed, plaintiff had already identified a number of these products in his *Reiffin II* infringement claims.

In its opposition, plaintiff implicitly concedes that he unduly delayed in seeking leave to amend. He focuses instead on the showing of prejudice defendant must make to demonstrate that denial of a motion for leave to amend is appropriate.

On this issue, defendant has not made the required showing. The infringement claims against other products of defendant all relate to the same patents at issue in the original *Reiffin I* action. The majority of the new products against which plaintiff wishes to assert claims of infringement are updated versions of products already named in the currently operative complaint.

Moreover, all discovery in this action, except for discovery relating to claim construction and § 112 issues, has been stayed. Defendant argues that plaintiff should have sought to amend the complaint to include products named in the *Reiffin II* but not *Reiffin I* complaint in April 2001, then presumably filed additional motions to amend the complaint as defendant released additional allegedly infringing products. Under that scenario, the posture of the litigation would be no different than if the court granted plaintiff's pending motion for leave to amend. See Pl Rep (Doc # 445) at 2. In either case, neither party would have engaged in any discovery regarding infringement up to the present. Although defendant is certainly correct that discovery will be expanded if new products are included in a second amended complaint, the legal issues toward the resolution of which that discovery is directed will not change materially. The patent at issue remains the same as do the kinds of allegations plaintiff seeks to make regarding the existing and newly identified products.

For these reasons, the court GRANTS in PART and DENIES in PART plaintiff's motion for leave to file a SAC. Doc # 436. Plaintiff may file a SAC alleging infringement of the '604 patent against all products newly identified in the proposed SAC *except* Microsoft's CE products. Plaintiff shall file a SAC in accordance with the terms of this order on or before May 3, 2003.

## VII

Lastly, the court addresses one remaining administrative matter. On September

12, 2002, plaintiff moved to enlarge time for hearing on defendant's motion for summary judgment of patent invalidity and unenforceability due to prosecution laches and plaintiff's Rule 56(f) motion. Doc # 416. By an order dated September 20, 2002, the court granted defendant's motion to enlarge time, rescheduling hearing for all pending motions on December 5, 2002. Doc # 425. Through a clerical error, plaintiff's motion to enlarge time (Doc # 416) continues to appear as pending on the court's docket. That motion (Doc # 416) is TERMINATED as an administrative matter.

## VIII

In sum, defendant's motion for partial summary judgment of invalidity and lack of priority under 35 USC §§ 112 and 120 (Doc # 373) is GRANTED. Defendant's motion to strike the Zaitlen declaration (Doc # 420) is GRANTED IN PART and DENIED IN PART. Plaintiff's FRCP 56(f) motion (Doc # 406) is DENIED. Defendant's motion for summary judgment due to prosecution laches (Doc # 370) is DENIED. Plaintiff's and defendant's motions to file an additional brief regarding plaintiff's motion for leave to file a second amended complaint (Doc ## 446, 449) are GRANTED. Plaintiff's motion for leave to file a second amended complaint (Doc # 373) is GRANTED in PART and DENIED in PART. Plaintiff's motion to enlarge time (Doc # 416) is TERMINATED as an administrative matter. A case management conference is scheduled for May 29, 2003, at 3:30, at which time the court will set a schedule for a trial limited to the issue of prosecution laches.

IT IS SO ORDERED.